# UNITED STATES AIR FORCE COURT OF CRIMINAL APPEALS

## UNITED STATES

**v.**

## Senior Airman JERRY C. HARRISON
## United States Air Force

## ACM 38745

## 20 July 2016

Sentence adjudged 26 September 2014 by GCM convened at Peterson Air Force Base, Colorado. Military Judges: Grant L. Kratz (arraignment) and Todd E. McDowell.

Approved Sentence: Bad-conduct discharge, confinement for 4 years, forfeiture of all pay and allowances, and reduction to E-1.

Appellate Counsel for Appellant: Captain Annie W. Morgan.

Appellate Counsel for the United States: Major Mary Ellen Payne; Major Meredith L. Steer; Major J. Ronald Steelman III; and Gerald R. Bruce, Esquire.

Before

ALLRED, DUBRISKE, and MAYBERRY
Appellate Military Judges

OPINION OF THE COURT

This opinion is issued as an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 18.4.

DUBRISKE, Judge:

Contrary to his pleas, Appellant was convicted by a panel of officer and enlisted members of rape, aggravated sexual assault, and communicating a threat, in violation of Articles 120 and 134, UCMJ, 10 U.S.C. §§ 920, 934. The rape and aggravated sexual assault convictions were based on the 2007 *Manual for Courts-Martial (MCM)* version of Article 120, UCMJ. Appellant was acquitted of additional specifications alleging sexual

assault and communicating a threat, as well as specifications of forcible sodomy, assault, and adultery.

Appellant was sentenced to a bad-conduct discharge, four years of confinement, forfeiture of all pay and allowances, and reduction to E-1. The convening authority approved the sentence as adjudged.

Appellant raises nine assignments of error on appeal. In his first three complaints, Appellant attacks the legal and factual sufficiency of his convictions for rape, aggravated sexual assault, and communicating a threat. Appellant next raises two assignments of error surrounding the military judge's handling of a Defense challenge for cause and a peremptory challenge by the Government during voir dire. Thereafter, Appellant argues the military judge erred in his handling of testimony from two witnesses. Appellant's final two arguments surround the military judge's management of propensity evidence.

Although we find error based on the military judge's use of charged offenses as propensity evidence, we have determined the error was harmless beyond a reasonable doubt and, therefore, affirm the findings and sentence in this case.

*Background*

The sexual assault offenses charged in this case surrounded Appellant's relationship with three different Airmen at Peterson Air Force Base, Colorado, over an approximately 19-month period from May 2011 until December 2012. The three Airmen did not know each other before the investigation of Appellant by the Air Force Office of Special Investigations (AFOSI). The Airmen were also not aware of Appellant's relationship with each Airman prior to the beginning of the criminal investigation.

AFOSI began their investigation of Appellant when the victim of the May 2011 rape allegation filed a complaint in January 2013. While this investigation was ongoing, another Airman, who had recently married Appellant, notified her supervisor that Appellant had assaulted her. This complaint was brought to the attention of AFOSI due to the ongoing rape investigation, and a subsequent interview of Appellant's spouse identified a second sexual assault victim. AFOSI eventually identified a third sexual assault victim during the course of their investigation.

Additional facts necessary to resolve the assignments of error are provided below.

*Sufficiency of the Evidence—Rape Conviction*

Appellant, in his first assignment of error, argues the evidence produced at trial was factually and legally insufficient to support his conviction for rape of Senior Airman (SrA) BG. In addition to attacking SrA BG's credibility, including her inability to remember

specific details of the incident, Appellant focuses on the prosecution's supposed failure to prove Appellant used sufficient force in committing the sexual act.

We review issues of factual and legal sufficiency de novo. Article 66(c), UCMJ, 10 U.S.C. § 866(c); *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002). Our assessment of legal and factual sufficiency is limited to the evidence produced at trial. *United States v. Dykes*, 38 M.J. 270, 272 (C.M.A. 1993).

The test for factual sufficiency is "whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, [we are] convinced of the [appellant]'s guilt beyond a reasonable doubt." *United States v. Turner*, 25 M.J. 324, 325 (C.M.A. 1987); *see also United States v. Reed*, 54 M.J. 37, 41 (C.A.A.F. 2000). In conducting this unique appellate role, we take "a fresh, impartial look at the evidence," applying "neither a presumption of innocence nor a presumption of guilt" to "make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt." *Washington*, 57 M.J. at 399.

The test for legal sufficiency of the evidence is "whether, considering the evidence in the light most favorable to the prosecution, a reasonable factfinder could have found all the essential elements beyond a reasonable doubt." *Turner*, 25 M.J. at 324; *see also United States v. Humpherys*, 57 M.J. 83, 94 (C.A.A.F. 2002). The term reasonable doubt does not mean that the evidence must be free from conflict. *United States v. Lips*, 22 M.J. 679, 684 (A.F.C.M.R. 1986). "[I]n resolving questions of legal sufficiency, we are bound to draw every reasonable inference from the evidence of record in favor of the prosecution." *United States v. Barner*, 56 M.J. 131, 134 (C.A.A.F. 2001).

As there was no dispute over whether the sexual act occurred, the primary question for the factfinder was whether Appellant used sufficient force to sustain a conviction for rape. "'[F]orce' means action to compel submission of another or to overcome or prevent another's resistance by . . . physical violence, strength, power, or restraint applied to another person, sufficient that the other person could not avoid or escape the sexual conduct." *MCM, United States*, app. 28, ¶ 45.a.(t)(5) (2012 ed.).

The testimony of SrA BG was sufficient to sustain Appellant's conviction for the elements of rape. SrA BG informed the court that Appellant showed up to her room one evening unannounced as she was engaged in personal Bible study. Appellant and SrA BG had only limited contact since initially meeting the previous week and had absolutely no discussions about their relationship ever becoming romantic or sexually intimate in nature.

In response to Appellant's question, SrA BG explained the meaning of the purity ring she wore and informed Appellant she did not believe in premarital sex. As she was showing Appellant where the Bible discusses premarital sex, SrA BG testified Appellant forcibly pushed her back onto her bed and pinned her arms down. His actions restricted

her ability to move her hands and thereby prevented her from being able to push Appellant off of her. This testimony provided sufficient evidence Appellant used force necessary to compel SrA BG's submission or to prevent her resistance. Furthermore, contrary to Appellant's claim in his brief, the factfinder was made aware Appellant outweighed SrA BG by approximately 60 pounds. This factor lends additional support to SrA BG's testimony about her inability to defend herself against Appellant's assault.

In attacking the factual sufficiency of this conviction, Appellant argues SrA BG's poor credibility and her inability to recall sufficient details about the incident provides justification for reversal. Based on the fact Appellant assaulted her without warning, however, it was not unreasonable for SrA BG to only recall limited details of the assault. Furthermore, the attack on SrA BG's credibility was minimized by the fact she had absolutely no motive to falsely accuse Appellant of rape. While the Defense tried to paint SrA BG as a jilted lover constantly trying to convince Appellant to continue their relationship, SrA BG did not report the assault for almost 20 months. She was not aware of Appellant's other romantic relationships during this intervening time, thereby discounting any claim that jealously drove her to report the crime to AFOSI. Her testimony that she finally decided to report Appellant after seeing sexual assault response program materials was more than plausible and mitigated concerns with her credibility

The evidence best supporting SrA BG's testimony, however, was Appellant's own statements. Although he had just met SrA BG and had not even begun to build a relationship with her, Appellant informed his supervisor he was aware SrA BG was a virgin and that he planned to "take her virginity." Approximately a week later, even though he had almost no personal contact with SrA BG, Appellant confirmed to his supervisor that he had taken SrA BG's virginity as planned. Appellant further informed his supervisor SrA BG just lay there during sex "like a dead fish." While Appellant's statements do not equate to a confession of the charged offense, they lend sufficient credence to SrA BG's testimony about Appellant's aggression towards a woman he barely knew for us to be convinced of his guilt beyond a reasonable doubt.

*Sufficiency of the Evidence—Aggravated Sexual Assault Conviction*

Next, Appellant attacks the legal and factual sufficiency of his conviction for aggravated sexual assault of Staff Sergeant (SSgt) EB. Appellant argues the evidence produced at trial fails to prove beyond a reasonable doubt that SSgt EB was substantially incapacitated as charged. Appellant highlights SSgt EB's lack of credibility as well as evidence contradicting her testimony that she was intoxicated on the evening of the sexual assault.

As an aside, Appellant asks us to consider a clemency submission from the Defense's expert witness at trial when examining whether this offense is legally and factually sufficient. This request, however, we cannot accommodate. Instead, we will only

examine the evidence admitted before the finder of fact at trial. *See United States v. Pease*, 75 M.J. 180, 184 (C.A.A.F. 2016).

Appellant and SSgt EB began dating in September 2011 and engaged in sexual activity over the course of their short relationship. In November 2011, SSgt EB ended the relationship, which caused some friction between Appellant and SSgt EB when they saw each other in public. In an effort to create a civil relationship with Appellant after their break up, SSgt EB testified she invited Appellant to a holiday party at a co-worker's home in December 2011. Appellant agreed to be the designated driver for this party.

SSgt EB testified she became intoxicated at this party after consuming two or three shots of alcohol and five or six mixed drinks. SSgt EB also remembered consuming alcohol while playing various drinking games. She clearly remembered kissing Appellant earlier during the party when she had only consumed a couple of drinks. SSgt EB testified she did not remember much towards the end of the party. She was later told she threw up, and was eventually cut off from consuming alcohol at the party.

Upon leaving the party, Appellant drove SSgt EB and a friend, SrA AD, to an off-base apartment where SrA AD was housesitting. SSgt EB testified she had no recollection of the ride to the apartment, but believed she had to be assisted into the vehicle. SSgt EB remembered being provided some sweatpants to sleep in when she arrived at the apartment.

SSgt EB further testified she remembered throwing up in the apartment bathroom twice that evening. After the second time, she believed Appellant carried her back to a couch in the living room where they both slept on it "foot to head." SrA AD slept in a separate bedroom.

At some point in the evening, SSgt EB remembered waking up on her stomach to significant pain. Although she was initially unclear as to what was happening, she realized Appellant was on top of her having sexual intercourse. SSgt EB testified she was too intoxicated to resist and she eventually fell back asleep.

When she awoke the next morning, SSgt EB suspected something sexually had happened to her as her sweatpants were on the floor. SSgt EB did not have any discussion with Appellant and eventually returned with SrA AD to their dormitory on base. Once back in her dormitory room, SSgt EB retrieved a tampon that had been pushed into her vaginal cavity due to sexual intercourse with Appellant. SSgt EB testified she would have obviously removed her tampon had she consented to sexual activity with Appellant the previous evening.

Later that day, SSgt EB spoke with Appellant about the incident. She testified Appellant acknowledged she was "asleep," but told SSgt EB she was "wet when [he] went in." Still later that same day, SSgt EB and Appellant engaged in consensual sexual

intercourse. When asked why she engaged in this activity given the incident the night before, SSgt EB stated she did it to show that she, and not Appellant, controlled her body when she engaged in sexual intercourse.

Approximately a week after the incident, SSgt EB told a friend about Appellant's assault. The friend testified at trial that SSgt EB was crying and distraught when discussing the incident. SSgt EB testified she never intended to report the assault to law enforcement, but did so once confronted with the incident by AFOSI. AFOSI had only learned of the allegation involving SSgt EB when Appellant's spouse provided limited details of an incident disclosed to her by Appellant. The AFOSI agent who interviewed SSgt EB testified she was clearly unaware as to why AFOSI called her in for an interview and repeatedly broke down emotionally when confronted with the allegation that Appellant engaged in sexual activity with her while she was intoxicated.

In claiming SSgt EB was not substantially incapacitated as supported by her testimony, Appellant first attacks her credibility by pointing to two witnesses who testified SSgt EB either did not drink much at the party or did not appear to be intoxicated. This attack is not compelling. Both witnesses admitted they had been drinking that evening, were unable to observe SSgt EB during the entire evening to know how much she had to drink, and generally had deficient memory due to the passage of time since the party. Moreover, one of these witnesses called by the Defense testified SSgt EB had good character for truthfulness.

Appellant also challenges SSgt EB's level of intoxication by noting the testimony of SrA AD. Although she admittedly did not have the ability to observe SSgt EB's alcohol consumption during the entire evening, SrA AD was able to observe SSgt EB after the party until she went to bed. SrA AD opined SSgt EB did not appear intoxicated. Moreover, SrA AD had no reason to believe SSgt EB vomited at any point after returning to the apartment.

SrA AD's testimony, albeit on its face damaging to the prosecution's theory, was rebutted by multiple statements from Appellant to SSgt EB and two other individuals in which he noted his awareness of SSgt EB's intoxicated state. Notwithstanding the statements made to SSgt EB after the assault as noted above, Appellant informed a mutual friend who confronted him about the incident that he knew he was wrong for how he acted during the evening. Later, Appellant made another statement to this same friend, in a conversation recorded by AFOSI, which could reasonably be interpreted as confirming SSgt EB was "intoxicated" at the time they engaged in sexual intercourse. Appellant also discussed his suspicions it was SSgt EB who had filed the initial sexual assault complaint against him.

Additionally, Appellant made statements to his wife after she confronted him about the AFOSI investigation when she learned about the various allegations of sexual assault.

Appellant informed her he had been sexually intimate with someone who had been drinking to a point she had vomited during the evening. When asked whether the female was "into" or actively engaged in the sexual activity, Appellant vaguely answered, "yeah . . . maybe . . . I don't know." While Appellant's spouse admitted she was unsure if he was confirming the incident occurred instead of just reporting what had been alleged against him, these statements corroborated SSgt EB's testimony, while concomitantly negating any claim of mistake of fact as suggested by Appellant.

Considering SSgt EB's testimony and the various statements from Appellant, we find the evidence was sufficient, when viewed in the light most favorable to the prosecution, for a reasonable finder of fact to conclude Appellant engaged in sexual intercourse with SSgt EB while she was substantially incapacitated. Moreover, making allowances for not personally observing the witnesses, we also conclude beyond a reasonable doubt, based upon our independent review of the record, that Appellant is guilty of the charged offense of aggravated sexual assault.

*Sufficiency of the Evidence—Communicating a Threat Conviction*

Appellant also attacks his conviction for communicating a threat to his wife, SrA LP. Appellant argues the evidence produced at trial was legally and factually insufficient as the prosecution failed to establish his conduct was service discrediting. Specifically, Appellant claims the evidence did not show the reputation of the United States Air Force was impugned by Appellant's conduct.

The incident giving rise to the charged specification developed one evening while Appellant and SrA LP were hosting a friend, Ms. JM, for dinner. Ms. JM was not associated with the military, and only knew Appellant and his spouse because of her duties as an apartment manager in the complex where they resided.

Appellant, who had been drinking during the evening, became upset when SrA LP made a joke about him "hitting like a girl" during a previous combatives course. Appellant immediately told SrA LP in an angry tone that he "would beat the f**king sh*t out of [her]." According to Ms. JM, Appellant then departed the room. A few nights after the incident, however, Appellant approached Ms. JM and apologized for his conduct as he was "way out of line."

Considering the entire record of the proceedings and our standards of review for legal and factual sufficiency, we find Appellant is also not entitled to relief on this assignment of error. To establish the element of service discrediting conduct, the prosecution must prove Appellant's conduct "would tend to bring the service into disrepute if it were known." *United States v. Phillips*, 70 M.J. 161, 166 (C.A.A.F. 2011). This legal determination depends on the facts and circumstances of the conduct, including the setting and the extent to which Appellant's conduct is known to others. *Id.* However, the

Government is not required to show anyone witnessed or became aware of the conduct. *Id.* In fact, proof of the conduct itself can be sufficient for a rational trier of fact to conclude an appellant's conduct was of a nature to bring discredit upon the armed forces. *Id.* at 163.

Here, even though neither SrA LP nor Ms. JM testified that Appellant's conduct lowered the reputation of the United States Air Force in their eyes, Appellant's threat, considering the totality of the circumstances, was more than sufficient to establish service discrediting conduct. First, given Appellant threatened to engage in an act of domestic violence, we are confident this type of conduct would bring the service into public disrepute. Second, Appellant's vulgar outburst was overheard by Ms. JM and there was evidence she was uncomfortable with the situation Appellant placed her in that evening. Appellant, himself, apparently realized the significance of his actions and apologized to Ms. JM after acknowledging he was in the wrong. For these reasons, we find Appellant's conviction for communicating a threat legally and factually sufficient. *See United States v. Caldwell*, 72 M.J. 137, 146 (C.A.A.F. 2013) (recognizing service discrediting conduct can be shown when conduct negatively impacts public opinion in theory and not in fact.).

*Denial of Defense Challenge for Cause*

In his fourth assignment of error, Appellant argues the military judge erred in denying his challenge for cause against Senior Master Sergeant (SMSgt) TE. Appellant argued at trial that SMSgt TE displayed both actual and implied bias when he made statements during voir dire that he believed a witness testifying under oath is presumed to be telling the truth until proven otherwise. Appellant argues this belief shifted the burden of proof to the Defense as Appellant was then forced to discredit the Government witnesses testifying under oath.

On appeal, Appellant expands his argument by alleging SMSgt TE's previous participation as a bystander intervention trainer should have caused the military judge to sua sponte excuse him for implied bias. Appellant opines SMSgt TE's training and personal research on alcohol consumption and its impact on the issue of consent would cause the public to question the fairness of Appellant's trial.

Rule for Courts-Martial (R.C.M.) 912(f)(1)(N) provides that a member shall be excused for cause whenever it appears that the member "[s]hould not sit as a member in the interest of having the court-martial free from substantial doubt as to legality, fairness, and impartiality." "This rule encompasses challenges based upon both actual and implied bias." *United States v. Elfayoumi*, 66 M.J. 354, 356 (C.A.A.F. 2008).

"The test for actual bias is whether any bias 'is such that it will not yield to the evidence presented and the judge's instructions.'" *United States v. Terry*, 64 M.J. 295, 302 (C.A.A.F. 2007) (quoting *United States v. Napoleon*, 46 M.J. 279, 283 (C.A.A.F. 1997)). Because "[t]he existence of actual bias is a question of fact," we

"provide the military judge with significant latitude in determining whether it is present in a prospective member." *Id.* (citing *United States v. Warden*, 51 M.J. 78, 81 (C.A.A.F. 1999)). "'Actual bias is reviewed' subjectively, 'through the eyes of the military judge or the court members.'" *Warden*, 51 M.J. at 81 (quoting *Napoleon*, 46 M.J. at 283). "[A] challenge based on actual bias is 'essentially one of credibility,' and because 'the military judge has an opportunity to observe the demeanor of court members and assess their credibility on voir dire,' a military judge's ruling on actual bias is afforded deference." *United States v. Briggs*, 64 M.J. 285, 286 (C.A.A.F. 2007) (quoting *United States v. Daulton*, 45 M.J. 212, 217 (C.A.A.F. 1996)).

Implied bias is "viewed through the eyes of the public, focusing on the appearance of fairness." *United States v. Bagstad*, 68 M.J. 460, 462 (C.A.A.F. 2010) (quoting *United States v. Clay*, 64 M.J. 274, 276 (C.A.A.F. 2007)). Therefore, appellate courts employ an objective standard when reviewing a military judge's decision regarding implied bias. *United States v. Strand*, 59 M.J. 455, 458 (C.A.A.F. 2004). We review issues of implied bias "under a standard less deferential than abuse of discretion but more deferential than de novo." *Id.* (quoting *United States v. Miles*, 58 M.J. 192, 195 (C.A.A.F. 2003)). In reviewing challenges for cause under the implied bias standard, military judges are required to follow the "liberal grant" mandate, which "supports the UCMJ's interest in ensuring that members of the military have their guilt or innocence determined 'by a jury composed of individuals with a fair and open mind.'" *United States v. James*, 61 M.J. 132, 139 (C.A.A.F. 2005) (quoting *United States v. Smart*, 21 M.J. 15, 18 (C.M.A. 1985)). "[I]n the absence of actual bias, where a military judge considers a challenge based on implied bias, recognizes his duty to liberally grant defense challenges, and places his reasoning on the record, instances in which the military judge's exercise of discretion will be reversed will indeed be rare." *Clay*, 64 M.J. at 277.

During voir dire, Appellant's trial defense counsel attempted to explore the members' ability to assess credibility. One question asked whether any member believed a person reporting they were sexually assaulted must "automatically be telling the truth." All members provided a negative response. The members also agreed with trial defense counsel that the testimony of a witness would not be more credible just because they reported they had been sexually assaulted.

For individual voir dire, trial defense counsel asked SMSgt TE a question about witness credibility based on his perceived reaction to the questions noted above during group voir dire. SMSgt TE provided the following response:

> [A]t face value I always give a person who is on the stand and who has sworn to tell the truth that they are going to tell the truth, but you can't guarantee that always. So I guess the question made me think a little bit about how trustworthy a person is, whether they are on the stand or not. I believe the

question was phrased as they actually get a, you know, an absolute un-judgmental view of being trustworthy. You can't guarantee that always so, I guess, that's what I was thinking of.

Based on this response, the following colloquy took place between trial defense counsel and the now-challenged member:

> [Defense Counsel] Okay. So let me kind of -- let me follow-up a little bit on that. Someone comes in here and they raise their hand and they take the stand, and they swear to tell you the truth. Are you essentially going to believe them unless there's some other reason [not] to believe them?
>
> [SMSgt TE] Um -- I try to give everyone the benefit of the doubt for honesty until I'm given a reason not to so . . .
>
> [Defense Counsel] Okay. Do you -- do you give any weight -- any particular weight to the oath that the person is taking that they're coming in here to tell the truth?
>
> [SMSgt TE] Yes, sir. I would hope that they will tell the truth because they're taking an oath in front of the court and in front of God. So I would hope they would be honest.
>
> [Defense Counsel] And so, essentially, if they are taking that oath and they are raising their hand, the default is you're essentially you think you ought to be believing them until given a reason not to?
>
> [SMSgt TE] Yes, sir.

Trial defense counsel subsequently challenged SMSgt TE based on these specific statements regarding witness credibility. With regard to actual bias, the military judge found SMSgt TE credible when he stated he would apply the law as provided to him and decide the case based solely on the evidence and instructions given by the military judge. After hearing arguments on the challenge, the military judge also entered the following findings regarding implied bias:

> I do not find that there is anything with regard to any of the answers to the questions posed by the parties or the court with regard to Senior Master Sergeant [TE] that will -- would lead to a perception of an injury to the appearance of fairness in the military justice system based on Senior Master Sergeant [TE's]

circumstances with regard to the issue raised by counsel, and that is the issue of taking an oath and having to evaluate credibility of a witness who provides testimony under oath. This member, along with all the members, clearly answered the questions with regard to the assessment that is to be applied to the credibility of witnesses. This particular member understood that instruction, answered affirmatively that he would apply that same standard in assessing the credibility of the witnesses and would not alter that based on the station or the circumstances of a particular witness. I take that to include the circumstances of whether a witness is an alleged victim of an offense presented or not and that he would apply that same standard to assessing the credibility of the witnesses.

And the member clearly understood that the burden remains with the government with regard to the burden of proof and he would apply that burden. Taking that into consideration along with the liberal grant mandate, I do not find evidence of implied bias. And, as I indicated, the defense challenge for cause against Senior Master Sergeant [TE] is denied.

We find no basis to question the military judge's findings on actual bias. The discussion during voir dire establishes SMSgt TE would yield to the evidence presented and the military judge's instructions.

We, likewise, find no error with the decision to deny the implied bias challenge. As noted by the Government in its brief, SMSgt TE's recognition of the importance of testimony under oath is not some novel concept indicative of bias. *See United States v. Stuckey*, 10 M.J. 347, 364 (C.M.A. 1981) ("[S]worn testimony typically is more credible and entitled to greater weight than information not given under oath."). SMSgt TE noted a witness should not get an "absolute un-judgmental view of being trustworthy" by testifying under oath, but instead must be evaluated based on all circumstances surrounding their testimony. This position is entirely consistent with the instructions provided by the military judge on assessing the credibility and believability of witnesses during trial. Moreover, as SMSgt TE did not differentiate his belief based on whether the witness was testifying for the prosecution or Defense, we find no basis to question the military judge's findings under a theory of implied bias.

With regard to Appellant's expanded bias claim based on SMSgt TE's experience as a bystander intervention trainer, we find this claim has been forfeited absent plain error as it was not asserted at trial. *See United States v. Bannwarth*, 36 M.J. 265, 268 (C.M.A. 1993); R.C.M. 912(f)(4). To establish plain error, Appellant must prove: "(1) there was

an error; (2) it was plain or obvious; and (3) the error materially prejudiced a substantial right." *United States v. Marsh*, 70 M.J. 101, 104 (C.A.A.F. 2011).

Appellant appears to argue SMSgt TE's experience as a trainer caused him to form a personal belief that a person cannot consent to sexual activity after consuming alcohol. This claim, however, is not supported by the record. SMSgt TE personally disagreed with the statement that a person could not consent to sexual activity after consuming alcohol. In doing so, he astutely noted that alcohol consumption effects the decision-making process of each person differently. We see nothing else in SMSgt TE's responses during voir dire which causes us to find error, plain or otherwise, in this case. The challenged member repeatedly advised he understood the military judge's instructions were the sole guidance to be applied by the panel members to the evidence elicited in Appellant's case.

*Granting of the Government's Peremptory Challenge*

Appellant next contends the military judge erred in granting the prosecution's peremptory challenge of Major NB in violation of *Batson v. Kentucky*, 476 U.S. 79 (1986). Appellant specifically argues the proffered reasons for the Government's challenge of the only African-American on the panel were unreasonable, implausible, or nonsensical. As we find the military judge's findings are adequately supported by the record, we decline to grant relief on this issue.

"As a matter of due process, an accused has a constitutional right, as well as a regulatory right, to a fair and impartial panel." *United States v. Downing*, 56 M.J. 419, 421 (C.A.A.F. 2002) (quoting *United States v. Wiesen*, 56 M.J. 172, 174 (2001)). "Discrimination in the jury selection process undermines our criminal justice system and poisons public confidence in the evenhanded administration of justice." *Davis v. Ayala*, 135 S. Ct. 2187, 2208 (2015).

In *Batson*, the United States Supreme Court prohibited the use of a peremptory challenge based on race. Our superior court has adopted a per se application of *Batson*, placing the burden on the challenging party, upon timely objection, to provide a race-neutral explanation for the challenge. *United States v. Moore*, 28 M.J. 366, 368 (C.M.A. 1989). The proffered reason for the challenge may not be one "that is unreasonable, implausible, or that otherwise makes no sense." *United States v. Tulloch*, 47 M.J. 283, 287 (C.A.A.F. 1997). A military judge's determination that the trial counsel's peremptory challenge was race-neutral is entitled to "great deference" and will not be overturned absent "clear error." *United States v. Williams*, 44 M.J. 482, 485 (C.A.A.F. 1996).

Here, the Government challenged Major NB based, in part, on her judicial temperament and demeanor in the courtroom. After reviewing the discussion in the record and the military judge's limited factual findings, we do not believe the military judge erred in granting the Government's peremptory challenge in this case. In so holding, we would

first note the member had recently served as an administrative discharge board member in a misconduct case where assistant trial counsel served as recorder. The final result of this board—retention of the respondent—was adverse to the Government's interest as put forth during the hearing. The use of this information in assessing Major NB's judicial temperament is race-neutral and, therefore, an appropriate consideration in weighing whether to keep Major NB on the panel.

Second, as relied on by the military judge, Major NB had a difficult time providing details about her prior service as a discharge board member. She had initially reported in response to the military judge's questioning that she had served as a panel member of a court-martial. In response to additional questioning, however, it became apparent Major NB had only participated in a discharge board. Major NB was unable to provide any details about the nature of the allegations heard by the board, claiming she had "brain dumped" the case once it was finished. While the member's confusion regarding the different forums is understandable, it, along with her inability to recall some basic facts of the previous case, also provides a race-neutral explanation justifying the military judge's ruling in this case.

*Military Judge's Ruling on Limited Testimony of the Victim's Background*

Turning to the merits of the trial, Appellant claims the military judge erred in allowing one of the victims, SSgt EB, to discuss her family's history of military service. Appellant argues this testimony was improper bolstering as the prosecutor was trying to suggest SSgt EB's testimony would be truthful because of her upbringing.

We review a military judge's decision to admit or exclude evidence for an abuse of discretion. *United States v. Clayton*, 67 M.J. 283, 286 (C.A.A.F. 2009). Under the abuse of discretion standard, we review the military judge's findings of fact under the clearly erroneous standard and his or her conclusions of law de novo. *Id.*

We do not believe the military judge erred in allowing SSgt EB to provide some limited information about her family, her upbringing, and her service in the United States Air Force. While the information did allow the court members to "get to know" SSgt EB when judging her credibility, her testimony did not suggest she was somehow more truthful because of how she was raised. Moreover, as the testimony was not focused on SSgt EB's character traits, including her character for telling the truth, the admission of this background information, which is commonly offered by fact witnesses during court-martial proceedings, was not error.

Even assuming the military judge erred, we are firmly convinced Appellant was not prejudiced by the admission of this testimony. *See* Article 59(a), UCMJ, 10 U.S.C. § 859(a). SSgt EB's credibility was primarily impacted by two factors unrelated to her testimony about her family's history of military service. First, a Defense witness testified SSgt EB possessed good character for truthfulness. Second, Appellant's own words helped

bolster SSgt EB's testimony about her level of intoxication on the evening of the charged sexual assault. Considering the entire record of trial, we are confident SSgt EB's testimony about her background did not improperly influence the guilty finding in this case.

*Military Judge's Ruling Prohibiting Panel Member's Question*

Related to the testimony of SSgt EB, Appellant also argues the military judge erred in refusing to allow a Defense witness, SrA AD, to respond to a court member's question regarding the reasons why SrA AD and SSgt EB were no longer friends. As with the previous assignment of error, we review the military judge's ruling for an abuse of discretion. *See Clayton*, 67 M.J. at 286.

As discussed in more detail above, SrA AD testified that SSgt EB did not appear intoxicated on the evening of the charged sexual assault. SrA AD also had no reason to believe SSgt EB vomited at any point after returning to the apartment after the party, which the Defense argued at trial rebutted SSgt EB's claims about her level of intoxication.

Trial defense counsel asked SrA AD at the start of her direct examination whether she was still friends with SSgt EB. SrA AD informed the court they were no longer friends. During cross-examination, in response to trial counsel's questioning, SrA AD reiterated she was no longer friends with SSgt EB and that the two of them had not had any recent contact with each other. SrA AD then informed the court members during her redirect examination that the change in her relationship with SSgt EB was not in any way motivating her to testify for the Defense in the case, or to tell lies regarding what she witnessed on the evening of the charged sexual assault.

After completion of SrA AD's testimony, a court member informed the military judge that he had a question for SrA AD. The question inquired as to what caused the friendship between SrA AD and SSgt EB to end. The Government objected to the question based on its belief SrA AD's answer would involve testimony covered by Mil. R. Evid. 412. The Government proffered SrA AD would testify SSgt EB was dating both a friend of SrA AD's boyfriend and another acquaintance at the same time. SrA AD felt SSgt EB's multiple relationships put her in an awkward position.

Prior to ruling on the matter, the military judge held a closed Article 39(a), UCMJ, 10 U.S.C. § 839(a), hearing to allow SrA AD to provide her answer to the question. SrA AD advised SSgt EB started "having relations with my friends or friends of friends," which put SrA AD in the middle of situations she did not want to associate herself with at the time. The military judge ruled the answer would implicate Mil. R. Evid. 412 as evidence regarding SSgt EB's sexual behavior.

As SrA AD did not explain what she meant by the term "relations" when discussing SSgt EB's conduct, there is an initial question as to whether the testimony actually

encompassed the definition of sexual behavior or sexual predisposition as restricted by Mil. R. Evid. 412. We need not address this question, however, as we find Appellant was not prejudiced by the military judge's decision not to allow the question to be answered.

We find no prejudice given SrA AD's credibility was effectively attacked by multiple statements from Appellant, as noted above, regarding his awareness of SSgt EB's intoxicated state. Given SrA AD's testimony was rebutted by Appellant's own words, we do not believe the elimination of any possible bias resulting from SrA AD's falling out with SSgt EB would have changed the result in this case.

*Improper Admission of Propensity Evidence*

Appellant next argues the military judge abused his discretion by failing to perform the necessary Mil. R. Evid. 413 analysis on the record before admitting propensity evidence. Appellant also alleges the propensity evidence instruction should not have been given due to the Government's failure to provide Appellant with notice of its intent to argue propensity. Appellant also attacks the constitutionality of Mil. R. Evid. 413. In doing so, Appellant acknowledges this rule has repeatedly been found constitutional by our superior court. *See United States v. Schroder*, 65 M.J. 49 (C.A.A.F. 2007); *United States v. Dewrell*, 55 M.J. 131 (C.A.A.F 2001); *United States v. Wright*, 53 M.J. 476 (C.A.A.F. 2000).

After the completion of the Defense's case-in-chief, the military judge held two R.C.M. 802 sessions where instructions on findings were discussed. The military judge then went over the instructions on the record inquiring whether the parties had any objections to the proposed instructions. One of the instructions addressed the factfinder's consideration of the charged offenses involving three different victims as evidence of Appellant's propensity to commit sexual assault. There was limited discussion of this particular instruction on the record, which failed to draw an objection from either side at trial. The court members were then instructed on their use of propensity evidence based on the pattern instruction in Department of the Army Pamphlet 27-9, *Military Judges' Benchbook*, ¶ 7-13-1 (10 September 2014).

Our superior court recently ruled in Appellant's favor on this particular matter in *United States v. Hills*, __ M.J. __, No. 15-0767/AF (C.A.A.F. 27 June 2016). The court determined the military judge erred in admitting three charged sexual assault offenses involving a single victim as propensity evidence. In so holding, the court noted that because the evidence of a charged sexual assault was already admissible to prove the underlying offense, the use of Mil. R. Evid. 413 was error.

> We hold that because the evidence of the charged sexual misconduct was already admissible in order to prove the offenses at issue, the application of Military Rule of Evidence (M.R.E.) 413—a rule of admissibility for evidence that would

otherwise not be admissible—was error. Neither the text of M.R.E. 413 nor the legislative history of its federal counterpart suggests that the rule was intended to permit the government to show propensity by relying on the very acts the government needs to prove beyond a reasonable doubt in the same case.

*Hills*, slip op. at 2.

In addition to finding the military judge erred in admitting charged offenses as propensity evidence, the court ruled the military judge's spill-over and propensity instructions were improper as the court members were provided with "directly contradictory statements about the bearing that one charged offense could have on another." *Id.* at 11. In so finding, the court noted it could not determine if "Appellant's right to a presumption of innocence and to be convicted only by proof beyond a reasonable doubt was not seriously muddled and compromised by the instructions as a whole." *Id.*

Given the instructional error raised constitutional due process concerns, the court examined the prejudicial effect of the error under the standard of harmless beyond a reasonable doubt. As similar instructions faulted by our superior court in *Hills* were given to the court members in this case, it is through this single lens that we now examine the impact of the propensity instruction errors in Appellant's case. We apply this more stringent standard of prejudice even though Appellant forfeited review of this issue absent plain error by not objecting to the military judge's instructions at trial. *See United States v. Flores*, 69 M.J. 366, 369 (C.A.A.F. 2011) (prejudice during a plain error review of a constitutional violation is examined under a harmless beyond a reasonable doubt standard).

We review de novo whether a constitutional error was harmless beyond a reasonable doubt. *United States v. Grijalva*, 55 M.J. 223, 228 (C.A.A.F. 2001). A constitutional error is harmless if it appears "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *United States v. McDonald*, 57 M.J. 18, 20 (C.A.A.F. 2002) (quoting *Chapman v. California*, 386 U.S. 18, 24 (1967)). Stated differently, "Is it clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error?" *Id.* (quoting *Neder v. United States*, 527 U.S. 1, 18 (1999)). In answering this question, we consider the entire record. *Delaware. v. Van Arsdall*, 475 U.S. 673, 681 (1986).

Applying this standard, we find any errors surrounding the admission of propensity evidence in this case to be harmless beyond a reasonable doubt. As noted by the Government in its brief, propensity evidence was not the focus of the prosecution case. In fact, during rebuttal argument, trial counsel specifically distanced the Government from any argument regarding Appellant's predisposition to commit sexual misconduct.

Regarding the strength of the Government's case, the two victims testified under oath and were subject to the crucible of cross-examination. While each victim had difficulty recalling certain details and engaged in counterintuitive behavior with Appellant after the assaults, their credibility was buttressed by Appellant's own statements. With regard to SrA BG's allegation, Appellant's *braggadocio* about taking her virginity affirmed SrA BG's testimony about Appellant's aggressive actions that resulted in the charged violation. Similarly, Appellant's multiple statements regarding his knowledge of SSgt EB's intoxicated state on the evening of the assault solidified the victim's testimony against him.

Our conclusion regarding the importance of Appellant's admissions is supported by the court members' findings. "Absent evidence to the contrary, court members are presumed to comply with the military judge's instructions." *United States v. Thompkins*, 58 M.J. 43, 47 (C.A.A.F. 2003). Here, Appellant was only convicted of sexual assault and threat offenses where the victim's testimony was aided by either Appellant's admissions or the testimony of an eyewitness. Provided the court members had misinterpreted the propensity instruction and applied a lesser burden of proof as suggested as a possibility in *Hills*, one would have expected guilty verdicts on the two sexual assault offenses Appellant was acquitted of at trial. For all of these reasons, we find any errors surrounding the admission of propensity evidence in this case to be harmless beyond a reasonable doubt.

In proceeding directly to a harmless error analysis, we recognize the facts of Appellant's case differ significantly from the evidence before the military judge in *Hills*. In particular, the propensity evidence in this case was primarily derived from charged offenses involving three separate victims over an extended period of time. While our superior court specifically recognized the purpose of Mil R. Evid. 413 is to address recidivism and, therefore, permits the bolstering of a victim's credibility through the use of evidence from other victims of an accused's sexual misconduct, it does not appear to us that the ultimate holding in *Hills* would have been different had the charged offenses involved multiple victims as found here. Regardless, given our ultimate conclusion regarding prejudice to this particular Appellant, we need not venture down this road today and attempt to further interpret the meaning of our superior court's holding in *Hills*.

*Corrected Promulgating Order*

Although not alleged as an assignment of error, Appellant noted the initial court-martial order addressing Specification 3 of Charge I failed to include the "by causing bodily harm" language as alleged by the Government on the charge sheet. We direct the publication of a new court-martial order to remedy this oversight.

*Conclusion*

The approved findings and sentence are correct in law and fact, and no error materially prejudicial to the substantial rights of the appellant occurred. Articles 59(a) and 66(c), UCMJ. Accordingly, the findings and the sentence are **AFFIRMED**.

FOR THE COURT

LEAH M. CALAHAN
Clerk of the Court

ACM 38745